Ex parte Fred J. Berkley, Petitioner.—50 S. W. (2d) 651.

Court en Banc, May 13, 1932.

*Randolph Laughlin* for petitioner.

*Douglas W. Robert* for respondent.

GANTT, J.—*Proceeding* in *habeas corpus*. Petitioner seeks discharge from confinement under judgment of a notary public committing him for contempt. He was committed on refusal to be sworn and give his deposition in a case entitled: "In the Matter of the Estate of John W. Thompson, Dec'd., appeal of Sara E. Thompson and Marcella T. Berkley, from an order of the Probate Court vacating the order of final settlement." The case is pending in the Circuit Court of the City of St. Louis. Appellants are administratrices of said estate. Respondent W. G. Coyle & Co., Inc., filed the motion in the probate court to set aside the order of final settlement of the administratrices. In the circuit court, respondent proceeded to take depositions before said notary.

The sheriff's return shows that he holds the prisoner under a writ of commitment issued by the notary on petitioner's refusal to be sworn as a witness and answer questions set forth in the writ of commitment and return of the sheriff.

Petitioner contends that no notice to take depositions in said case was served on appellant administratrices and for that reason the notary was without authority to issue the writ of commitment.

Wm. O. McMahon, detective and private process server, made an affidavit of service that he served the notice on Sara E. Thompson in the city of St. Louis on March 2, 1932, by leaving a copy of same at the usual place of abode of said Thompson with a member of her family above the age of fifteen years. He also made an affidavit of service that he served the notice on Marcella Berkley in the City of St. Louis on March 3, 1932, by leaving a copy of same at the usual place of abode of said Berkley with a member of her family above the age of fifteen years.

The only evidence on the question of service on Marcella Berkley is the testimony of Charles Berkley and the affidavit of McMahon attached to the notice to take depositions.

Charles Berkley testified that he resided at 4950 Lindell Boulevard; that petitioner Fred Berkley is his brother and resided at 4944 Lindell Boulevard; that Marcella Berkley is the wife of Fred Berkley; that on the evening of March 3, 1932, he was at the home of petitioner; that on leaving and as he entered the hall a strange man offered him a paper and said: "This is for you, Mr. Berkley;" that he said: "My name is Charles Berkley, not Fred Berkley;" that the stranger said: "Well, you are served just the same;" that he then forced a paper into the lapel of his (Berkley's) coat; that by this time they were walking toward the stairs; that at the head of the stairs a third man joined them and they walked down together; that he afterwards learned that the man who thrust the notice to take depositions in his coat was named Wm. O. McMahon, and that the man who joined them at the head of the stairs was a detective named Arthur Abner.

McMahon testified before this court on the question of service of notice to take depositions. Respondent sheriff did not inquire of him as to service on Marcella Berkley. The testimony of Charles Berkley stands uncontradicted. He was not a member of the family of Marcella Berkley. It follows that the affidavit of McMahon that he delivered a copy of the notice to a member of her family is untrue. Respondent sheriff did not believe said affidavit of McMahon. In effect he abandoned the contention that Marcella Berkley was served by anticipating our ruling on the question. He stated in his brief that "although service was had upon both administratrices, service upon one was sufficient." There was no service on Marcella Berkley.

As to service on Mrs. Thompson, McMahon testified that on the afternoon of March 2, 1932, he went to the rear door of the Thompson home and rang the bell; that a maid partly opened the door and he inquired if she thought he was a burglar; that he then inquired if Nellie Bryan lived there; that she answered that no such person lived there or had lived there for five years; that she then closed the door.

He further testified that about nine o'clock that night he went to the front door of the Thompson home and rang the bell; that the porch was closed to the public by grille doors and he stood on the step; that the same maid opened the door and walked out onto the porch; that he inquired for Mrs. Thompson; that the maid said Mrs. Thompson was not at home; that he told her he had a paper for Mrs. Thompson; that through the openings in the grille door he delivered to her a copy of the notice to take depositions; that after taking the paper she dropped in on the porch; that he then left the premises. He identified Anna Kirby as the person who appeared at the rear door and the person to whom he delivered a copy of the notice while she was standing on the front porch.

Anna Kirby, the maid, testified that on the afternoon of March 2, 1932, the rear doorbell rang; that she opened the door not more than an inch; that through the opening she saw a stranger of large and powerful build; that he was about six feet tall and weighed about 230 pounds; that he inquired for some strange woman supposed to work there; that she never heard the name before and told him that no such person worked there or had worked there during the last five years, and that she then closed the door and bolted it.

She further testified that about nine o'clock that night the front doorbell rang and she opened the door about four inches; that the night was dark but she could see the figure of a man on the other side of the grille; that she could not distinguish his features, but when he spoke she thought he was the same man who rang the bell at the rear door and inquired for a strange woman; that he asked for Mrs. Thompson and she answered that she was not at home; that she then closed the door and bolted it; that she thought the stranger was a bad character who was trying to gain entrance for the purpose of robbery; that his call at the rear door in the daytime and the front door late at night, and the fact that he asked for a fictitious person in the afternoon and for Mrs. Thompson in the evening all convinced her that he was there for no good purpose; that she had instructions from Mrs. Thompson not to admit strange men; that the iron grille doors are locked all the time and they are flush with the porch floor and the openings in them are not large enough to admit a man's hand; that the stranger at no time said he had any message or paper for Mrs. Thompson; that he did not offer her any message or paper for Mrs. Thompson, and if he poked a paper through an opening in the grille, she did not see him do so and did not learn that he claimed to have done so for more than two weeks thereafter.

Mrs. Thompson testified that she and three maids occupied the home; that chains are used to control the opening of outside doors; that the front porch is closed to the public by a grille which is seven feet from the front door; that the grille is kept locked both day and night; that it cannot be unlocked without removing the chain from the front door, crossing the intervening seven feet of the porch and unlocking the safety latch on the inside of the grille doors; that the openings in the metal grille are not wider than an inch and one-eighth at any point; that during the winter the newspaper carried accounts of robberies in homes perpetrated by robbers who had forced an entrance and that on account of the general distress and prevalence of crime she instructed the maids not to be tricked into admitting a strange man on any pretense whatever; that after nine o'clock on the night of March 2, 1932, Mrs. Collins, a neighbor, telephoned that she (Mrs. Collins) was sending her husband to return a book she had borrowed; that she instructed Anna (the maid) to answer Mr. Collins' ring when he called to return the book.

Richard J. Collins testified that he lived at 4712 Westminster Place; that Mrs. Thompson, a friend of his wife, lived at 17 Hortense Place; that on the evening of March 2, 1932, he told his wife he was going for a walk; that she asked him to return a book she had borrowed from Mrs. Thompson, that he took the book and rang Mrs. Thompson's front door bell about 9:30 P. M.; that he left the book with the maid who answered the bell; that as he was leaving he picked up a paper on the porch which he thought was an advertising circular; that later he discovered it was a notice to take depositions; that he telephoned Fred J. Berkley that he had the paper and asked what to do with it; that Berkley told him to keep it until he called for it; that he did so and attached said paper to his affidavit.

There is no material conflict in the evidence except as to delivery of a copy of the notice to the maid. For reasons stated in the evidence, it must be conceded that it was difficult to gain entrance to the home of Mrs. Thompson. It was so guarded that Mrs. Collins, a neighbor, called on the telephone to notify Mrs. Thompson that Mr. Collins would call to return a book. It also must be conceded that the appearance of McMahon at the rear door of the home, inquiring for a fictitious person, frightened the maid. McMahon noticed her fright and inquired if she thought he was a burglar. Of course, the re-appearance of McMahon at the home that night inquiring for Mrs. Thompson would also frighten the maid. If so, it may be inferred that the maid hesitated to and did not step from the room to the porch. Unless she did so, it would have been impossible for McMahon to deliver to her the notice.

Furthermore, McMahon stands discredited because of his conduct as to service on Marcella Berkley. At the time he made the affidavit of service on her he may have believed that he delivered a copy of the notice to a member of her family; but he could and must have later learned that Charles Berkley was not a member of her family. In this situation he should have withdrawn said affidavit of service. The facts and circumstances considered, we do not believe that a copy of the notice to take depositions was delivered to the maid and by her dropped on the porch.

Respondent sheriff argues that the identification of the maid by McMahon at the hearing before this court indicates service on Mrs. Thompson. We do not think so. It is not claimed that the maid stepped from the room to a porch at the rear door. However, his observance of her at that door enabled him to identify her as the person who appeared at the front door. Moreover, there were many ways of learning her identity after the day in question.

Absent notice to the adverse party, the notary was without authority to commit petitioner to jail on his refusal to be sworn as a witness and give his deposition. [Burnett v. Prince, 272 Mo. 68, 197 S. W. 241; Tiede v. Fuhr, 264 Mo. 622, l. c. 628, 632, 175 S. W. 910.]

386

Petitioner should be discharged. It is so ordered. It is further ordered that petitioner have and recover from W. G. Coyle & Co., Inc., his costs herein expended (Sec. 1773, R. S. 1929), and that execution issue therefor. All concur.